# United States District Court

NORTHERN   DISTRICT OF   TEXAS

*FILED JUN 21 2013 — CLERK, U.S. DISTRICT COURT, NORTHERN DISTRICT OF TEXAS, By Deputy*

UNITED STATES OF AMERICA

V.

JAMES STUART

**COMPLAINT**

CASE NUMBER: 3-13-MJ- 381-BH

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief. Beginning on or about <u>January 2012 to the present</u> in <u>Dallas and Tarrant</u> Counties, in the Northern District of Texas, defendant(s) did,

> knowingly and intentionally combine, conspire, confederate and agree with other persons known and unknown to commit the following offense against the United States: to possess with intent to distribute a Schedule I controlled substance analogue,

in violation of Title  <u>21</u>  United States Code, Section(s) <u>841(a)(1) & (b)(1)(B), 846 and 863</u>.

I further state that I am a(n) <u>Special Agent</u> of the <u>Drug Enforcement Administration (DEA)</u> and that this complaint is based on the following facts:

> See attached Affidavit of Special Agent, Richard C. Gardner, DEA, which is incorporated and made a part hereof by reference.

Continued on the attached sheet and made a part hereof:    XX Yes    No

_____
Signature of Complainant
Kerry White
Special Agent, DEA

Sworn to before me and subscribed in my presence, on this 21st day of June, 2013, at Dallas, Texas.

IRMA C. RAMIREZ
UNITED STATES MAGISTRATE JUDGE
Name & Title of Judicial Officer

_____
Signature of Judicial Officer

# AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Kerry White, a Special Agent with the Drug Enforcement Administration (DEA), being duly sworn, depose and state as follows:

## Introduction

1. I have been employed as a Special Agent with DEA for over 8 years, and I am assigned to the Dallas Field Division Office to conduct investigations of violations of federal drug statutes. I have conducted and participated in previous investigations of violations of the drug laws of the United States, including violations of Title 21, United States Code, Section 841(a)(1), 846, and 863.

2. I am a law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, and I am empowered by law to conduct criminal investigations and to make arrests for federal felony offenses.

3. I have reason to believe that, James Stuart has unlawfully committed a violation of 21 U.S.C. §§ 841(a)(1) & (b)(1)(C), 846, and 863 - conspiracy to possess with the intent to distribute a Schedule I controlled substance.

4. I obtained the following information from my own observations and information provided to me by other law enforcement officers involved in the investigation.

## Synthetic Cannabinoids

5. The Controlled Substances Act (CSA) contains a drug analogue[1] statute that classifies chemical analogues of existing scheduled drugs as a scheduled drug in the same category. As a result of this statute and the prevalence of marijuana analogues, on March 1, 2011, DEA administratively placed five synthetic cannabinoids that were commonly found in synthetic marijuana products (JWH-018, JWH-073, JWH-200, CP-47,497, and Cannabicyclohexanol) in Schedule I of the CSA, which temporarily banned them and their analogues for one year pending DEA and Food and Drug Administration studies. On February 29, 2012, DEA extended the Schedule I status of these substances for six months pending the passage of a final regulatory ruling.

6. On July 9, 2012, the President signed into law the Synthetic Drug Abuse Prevention Act of 2012 (SDAPA). SDAPA amended the Controlled Substances Act by placing 26 substances in Schedule I. The list of legislatively scheduled controlled substances is found at 21 U.S.C. 812(c) and the current list of scheduled substances is published at 21 C.F.R. § 1308. These initial schedules may be modified either by legislation or by rulemaking. The legislation also creates a new definition for "cannabimimetic agents,[2]" which creates criteria by which similar chemical compounds

---

[1] A controlled substance analogue is defined as a substance which: (1) has a chemical structural substantially similar to that of a controlled substance in Schedules I or II; (2) has a stimulant, depressant or hallucinogenic effect on the central nervous system that is substantially similar to or greater than that of a controlled substance in Schedules I or II; or (3) a particular person represents or intends to have a stimulant, depressant, or hallucinogenic effect substantially similar to or greater than that of a controlled substance in Schedules I or II [21 U.S.C. 802(32)].

[2] "Cannabimimetic agents," as defined in SDAPA are controlled under Schedule I and unless specifically exempted or unless listed in another schedule, any material, compound, mixture, or preparation which contains any quantity of the following

**Affidavit in Support of Criminal Complaint - Page 2 of 8**

can be controlled. Synthetic cannabinoids refer to a family of substances that act on the brain similar to delta-9 THC, the main psychoactive constituent of cannabis.

7. On December 21, 2012, DEA published a rule to establish drug codes for these substances, and to make technical and conforming amendments in accordance with SDAPA.

8. DEA has also placed the following substances on a temporary listing of substances subject to emergency scheduling. Any material, compound, mixture, or preparation which contains any quantity of the following substances:

    a) 4-methyl-N-methylcathinone (mephedrone);

    b) 3,4-methylenedioxy-N-methylcathinone (methylone); and

    c) 3,4-methylenedioxypyrovalerone (MDPV)

9. On May 16, 2013, DEA made the synthetic cannabinoids UR-144, XLR-11, and AKB48 Schedule I, illegal drugs under the Controlled Substances Act (CSA) for the next two years. Part of the press release explained "These cannabinoids are often seen in

---

substances, or which contains their salts, isomers, and salts of isomers whenever the existence of such salts, isomers, and salts of isomers is possible within the specific chemical designation:
    a. 5-(1,1-dimethylheptyl)-2-[(1R,3S)-3-hydroxycyclohexyl]-phenol (CP-47,497);
    b. 5-(1,1-dimethyloctyl)-2-[(1R,3S)-3-hydroxycyclohexyl]-phenol (cannabicyclohexanol or CP-47,497 C8-homolog);
    c. 1-pentyl-3-(1-naphthoyl)indole (JWH-018 and AM678); 1-hexyl-3-(1-naphthoyl)indole (JWH-019);
    d. 1-[2-(4-morpholinyl)ethyl]-3-(1-naphthoyl)indole (JWH-200);
    e. 1-pentyl-3-(2-methoxyphenylacetyl)indole (JWH-250);
    f. 1-pentyl-3-[1-(4-methoxynaphthoyl)]indole (JWH-081);
    g. 1-pentyl-3-(4-methyl-1-naphthoyl)indole (JWH-122);
    h. 1-pentyl-3-(4-chloro-1-naphthoyl)indole (JWH-398);
    i. 1-(5-fluoropentyl)-3-(1-naphthoyl)indole (AM2201);
    j. 1-(5-fluoropentyl)-3-(2-iodobenzoyl)indole (AM694);
    k. 1-pentyl-3-[(4-methoxy)-benzoyl]indole (SR-19 and RCS-4);
    l. 1-cyclohexylethyl-3-(2-methoxyphenylacetyl)indole 7008 (SR-18 and RCS-8);
    m. 1-pentyl-3-(2-chlorophenylacetyl)indole (JWH-203) and
    n. 1-butyl-3-(1-naphthoyl)indole (JWH-073);

so-called 'fake pot' products that are falsely marketed and sold as 'herbal incense' or 'potpourri' products on the Internet and by a variety of retail stores."

10. Pursuant to 18 U.S.C. § 813, a controlled substance analogue (even one not specifically listed on the banned list) will be treated, for purposes of Federal law, as a controlled substance in schedule I if the substance is intended for human consumption.

**Facts**

11. In April 2013, DEA cultivated a cooperating source (CS) who agreed to provide assistance in an ongoing investigation into distributors and/or manufacturers of marijuana analogues. This CS provided information that EZ Way Smoke Shop in Dallas, Texas was a large distributor and/or manufacturer of marijuana analogues. In addition, the CS identified James Stuart and Evelyn Worthington as suppliers of marijuana analogues and synthetic cannabis. According to the CS, Stuart and Worthington were manufacturing their own product in bulk using the chemical JWH-018, and they were purchasing additional synthetic cannabis from EZ Way Smoke Shop.

12. A search of public records revealed that Worthington began operating a business by the name of Sweet D's, located at 753 N. Main, Paris, Texas, in December 2011.

13. On April 16, 2013, the Paris Police Department (PPD) conducted an undercover purchase of five packages of suspected smokable synthetic cannabinoids from Sweet D's. During the purchase, Bradley Lenington was identified as the individual who conducted the sale. Four packages were identified to be a smokable synthetic

cannabinoids with the street name of "Black Lion" and the fifth package was identified by the street name of "Purefire." Laboratory tests indicate that "Black Lion" contains a substance identified as 5F-PB 22. 5F-PB 22 has been determined by DEA to be a cannabimimetic agent recently entering the illegal synthetic cannabis market in 2013. Laboratory tests indicate that "Pure Fire" contains a substance identified as XLR-11. XLR-11 is banned at both the state and Federal level as being an analogue of marijuana.

14. During the months of February, March, April, May and June 2013, investigators conducted periodic surveillance checks of Sweet D's. During these checks, investigators noted a steady amount of customers entering the building. These customers arrived by foot and by automobile. Those arriving by vehicle were by far the largest and mostly consisted of a driver and passenger. In these instances, the driver would remain with the vehicle, with the engine running, while the passenger would go inside. The customer would quickly exit the store, get back into the vehicle, and then immediately drive away. Investigators have estimated that the average amount of time a customer was in the Sweet D's was approximately 60 seconds, and the rush of the vehicles arriving and departing nearly caused accidents on many occasions.

15. Additionally, investigators never witnessed customers exiting the store with anything in their hands (i.e. sacks appearing to be a purchased product of any type). However, investigators often observed customers, and their drivers, immediately open packages and begin to smoke what appeared to be self-rolled cigarettes (joints) or small

pipes, which is consistent with the consumption of a controlled substances, once they were back in their vehicles.

16. On May 14, 2013, members of Lamar County law enforcement conducted a traffic stop on a silver 2002 Pontiac Grand Am, after an officer observed what he believed to be a hand-to-hand drug transaction take place. The traffic stop occurred at Sweet D's and the driver was identified as Bradley M. Lenington. A consensual search of the automobile revealed numerous packages of synthetic cannabis. In addition a locked money bag, which Lenington provided the key, contained a significant amount of money comprised mostly of $20 bills. Lenington told the officers that he was the manager of Sweet D's, and a short time after the end of the car stop, the Chief of Police for Paris, Texas, received a telephone call from Stuart complaining about the car stop of Lenington. Stuart claimed the traffic stop was an act of "harassment" on his employee by the police.

17. On June 21, 2013, federal search warrants were executed on the residences of Worthington, Stuart, and Lenington. After executing the search warrants, Worthington agreed to speak with investigators involving her involvement with the sale of marijuana analogues. According to Worthington, in January 2012, she and Stuart went to Dallas, Texas, and made their first bulk purchase of synthetic cannabis from EZ Way Smoke Shop. The initial purchase was in cash, but subsequent purchases have been made by money order, cashier's check, checks written directly from Sweet D's checking account, and cash. Worthington stated that they were charged $6.50 a gram by EZ Way Smoke

Shop. A review of Sweet D's checking account at People's Bank revealed that over $80,000 in checks had been written directly to EZ Way Smoke Shop since January 2012.

18. Worthington admitted to investigators that they (everyone associated with Sweet D's) were aware that individuals were smoking the products they were selling, and that the manufacturers were attempting to stay one step ahead of law enforcement by continuing to change the chemical make-up of the product.

19. On June 21, 2013, Lenington also agreed to speak with investigators about his involvement with the sale of marijuana analogues. Lenington stated that he used to be the manager of Sweet D's, working for Stuart and Worthington. According to Lenington, around October 2012 and afterward, he accompanied Stuart to purchase synthetic cannabis from EZ Way Smoke Shop on at least five occasions. The products were picked up in Lewisville, Texas, and the bulk product was packaged in 3 x 3 x 3 foot containers, and some product was sent to Worthington via FedEx from Arlington, Texas. Lenington stated that each sale ranged from $50,000 - $150,000 and Stuart always paid in cash. On or about June 6, 2013, Sweet D's closed its storefront location in Paris, Texas. Once Sweet D's closed, Lenington stated that he would meet with Stuart, on an almost daily basis, to get synthetic cannabis to sell around town in hand-to-hand deals and to return the profits to Stuart. Lenington knew the products were intended for human consumption and had even witnessed Stuart smoking the product.

## Conclusion

20. For the reasons stated above, I believe that probable cause exists that James

Stuart, Evelyn Worthington, and Bradley Lenington have committed a violation of 21 U.S.C. §§ 841(a)(1) & (b)(1)(C), 846, and 863 - conspiracy to possess with the intent to distribute a Schedule I controlled substance.

*[signature]*
Kerry White
Special Agent
Drug Enforcement Administration

Subscribed and sworn to before me this the 21st day of June, 2013.

*[signature]*
IRMA C. RAMIREZ
United States Magistrate Judge